## INTHE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GROUPCHATTER, LLC,

        Plaintiff,

v.

RAKUTEN, INC.,
VIBER MEDIA S.A.R.L., and
VIBER MEDIA (USA) INC.,

        Defendants.

CIVIL ACTION FILE

NO. _____

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff GroupChatter, LLC files this Complaint against Defendants

Rakuten, Inc., Viber Media S.a.r.l., and Viber Media, Inc. (each a "Defendant" and

collectively "Defendants" or "Viber") for infringement of U.S. Patent Nos.

7,945,249; 8,588,207; 9,014,659, and 9,294,888.

## THE PARTIES

1.     Plaintiff GroupChatter, LLC ("GroupChatter") is a Texas limited

liability company with its headquarters and principal place of business at 1400

Preston Road, Suite 475, Plano, Texas 75093.

2.     Defendant Rakuten, Inc. ("Rakuten") is a Japanese Corporation and

may be served at its principal place of business at Rakuten Crimson House,

Rakuten Crimson House, 1-14-1 Tamagawa, Setagaya-ku, Tokyo, 158-0094 pursuant to the Hague Convention.

3.      Rakuten is the ultimate parent corporation to Viber Media S.a.r.l. and Viber Media (USA), Inc.

4.      Defendant Viber Media S.a.r.l. is a foreign company and may be served at its principal place of business at 2, Rue du Fosse, Luxembourg, Luxembourg L-1536 pursuant to Fed. R. Civ. P. 4(f) and the Hague Convention.

5.      Defendant Viber Media (USA) Inc. ("Viber Media") is a Delaware corporation with its principal place of business in Las Vegas, Nevada.  Viber Media may be served through its registered agent PHS Corporation Services, Inc., 1313 N. Market St., Suite 5100, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

6.      GroupChatter brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  Defendants do business in this judicial district, have provided downloads of the Viber application to users in this district, committed

acts of infringement in this judicial district, and have purposely transacted business in this judicial district involving the accused products.

8.      Defendants are subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Georgia Long-Arm Statute, due at least to their substantial business in this State and judicial district, including: (A) at least part of its infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold and services provided to Georgia residents.

## GROUPCHATTER PATENTS

9.      Viber has infringed and continues to infringe U.S. Patent Nos. 7,945,249 (the "'249 Patent"); 8,588,207 (the "'207 Patent"); 9,014,659 (the "'659 Patent"), and 9,294,888 (the "'888 Patent") (collectively "the Asserted Patents").

10.     The '659, '207, and '888 Patents relate to methods, apparatuses, and systems for providing acknowledged, deterministic mass messaging over a two-way wireless network.

11.     The '249 Patent relates to socially networking groups of users to enable sharing, acknowledging, and rating content while providing updates regarding user status.

**GroupChatter '659, '207, and '888 Patents**

12.     The GroupChatter Asserted '659, '207, and '888 Patents describe a
two-way communication system and method providing acknowledged responses to
group messages to enable deterministic group messaging within the claimed
network architecture and addressing scheme.

13.     "Deterministic" group messaging refers to one of the advantages
delivered by the inventions.  Using the claimed system offers the potential benefit
of providing timely updates for and from endpoints within a group.  In operation,
these endpoints (e.g., smartphones, pagers, utility meters, transponders, etc.) send
responses to group messages and thereby provide data from which to determine the
status of each endpoint.

14.     Broadly speaking, GroupChatter accuses Viber of infringement for
providing, operating, testing, and using its Viber ecosystem (e.g., infrastructure and
software) that allows its users to conduct and participate in group messaging (e.g.,
deterministic, acknowledged, and within a social network) as recited in the
Asserted Claims.

15.     The inventors noted in the patent specification that certain
communication networks, even those with endpoint devices capable of
acknowledging group messages, failed to provide the valuable advantage of

deterministic communication because they provided no way to maintain status of each group member.  This left administrators lacking important data about the status of each group member.

16.     To solve this problem and other shortcomings of prior two-way wireless messaging networks, the inventors conceived a novel combination for maintaining group management information and organization for use on a wireless network.  They describe in the Asserted Patents how to build and deploy the network architecture to use it and achieve these benefits.

17.     In the Asserted Claims of the '659, '207, and '888 Patents, endpoints are identified by information about the user or specific endpoint device and by groups that particular recipient belongs to.  In addition to the two-way wireless architecture of the radio network, a client/server-based architecture is provided for communication between a network client and the two-way wireless network.

18.     Through client/server interactions, a user is provided up-to-date group information that may include address information, status information pertaining to a message or response, overall group detail and status, or even specific information about endpoints within a group.

19.     In operation, Viber stores recipient identifiers, one or more group identifiers for each recipient endpoint, and group membership data that identifies

which recipients belong to specific groups.  An endpoint may belong to multiple groups and thus may be associated with multiple group identifiers.

20.    A Viber group message is initiated via a network client and wirelessly transmitted to endpoint devices located anywhere within the range of the wireless network infrastructure.  Endpoints are configured to receive a group messages and respond with status information, alphanumeric text entries, or other information based upon the message and endpoint device status.

21.    Efficient group management and maintenance is an advantage of the claimed system and is demonstrated in operation of the claimed invention by reference to and communication with selected endpoints and groups of endpoints that each have a subset of the group information data stored locally.

22.    FIG. 1 of the '207 Patent (reproduced below) depicts at a high level aspects of an embodied network related to one or more claims:



23.     As shown, exemplary structural elements for an embodied system include: (1) a network client 20; (2) a network switch or server 12 coupled to a receiver database 18; (3) a wireless network 14; and (4) a plurality of mobile receivers 16 (e.g., smartphones, meters, etc.).

24.     As background, the inventors conceived the subject matter of the patents-in-suit in part to address issues in communication networks of the day.  For example, some radios and associated wireless networks used by emergency responders were unable to handle the heavy network traffic that circumstances unfortunately required.  '207 Patent, col. 1; lines 40-49.  The "Background of the Invention" states:

> "during the events of Sep. 11, 2001, radio channels became oversaturated, and interoperability problems among jurisdictions and agencies persisted throughout the entire response process. Otherwise compatible portable radios were preprogrammed in a manner that precluded interoperability. Cellular telephone systems and even the public switched telephone network (PSTN) became congested and unusable."

25.     During the September 11 tragedy, older pager systems proved more reliable than cell phone networks.  But while pager-based systems had the potential to be relatively robust in emergency circumstances, such systems of the time were unable to efficiently process group messages (i.e., messages to groups of recipients) and track the individual responses to know which members of the group

had responded.  The Background of the Invention section of the specification states:

> *"none of these systems provide a network interface sufficient to support acknowledged group messaging. Requiring that the message originator individually alert each recipient adds considerable setup delay when alerting large groups."*

26.    Accordingly, the inventors conceived the invention(s) to address these problems.  The result was a novel system that efficiently used limited bandwidth and network resources to effectively communicate with selected endpoints groups whose membership may be dynamically created and adjusted.  Even in these conditions, the inventors sought to provide effective group management and improved network efficiency, operability, and reliability (based on the challenges of the time).

27.    The Asserted '659, '207, and '888 Patents require, among other things, a specific network architecture that may include at least: wireless network (e.g., a cellular network) infrastructure (e.g., base stations, backhaul, transmitters, receivers, antennae, Viber servers, and central switch), and multiple network clients (e.g., smartphones running Viber and equipped with two-way wireless communication modules for communicating on the wireless network).

28.    The subject matter of the system and method claims asserted against

Defendant are tied to the structural deployment described in the Asserted Patents and address shortcomings in group management and communication that the inventors experienced before their invention.

29.    In operation, the Asserted Claims detail how a message originator, who may lack knowledge of specific details regarding a particular endpoint group, is provided group information to the network client.  Such information may include membership information for each group, the number of recipient endpoints sharing a group identifier, or an identifier shared by certain recipient endpoints within a group.

30.    The claims recite a specific method for providing this information. The Asserted Claims of the '659, '207, and '888 Patents describe and recite the source of group and recipient endpoint information, how and when it is transmitted to a network client, and how it may be displayed and updated at the network client.

31.    In an example scenario where an incident commander is seeking assistance over a pager network, a notification feature can provide the commander (i.e., the message originator) details about the number, identities, and statuses of group members.  Using the invention for this feature, the commander is able to determine based upon the group messaging system information, a status of group members.  Without this feature, an incident commander may have insufficient

context to know whether enough personnel were being summoned, or whether key individuals had been mobilized.[1]

32.     By using the claimed addressing scheme described in the Asserted Patents, Defendant and other infringers are able to communicate to ad hoc or dynamically organized groups of users.

33.     Additional meaningful claim elements in the Asserted Claims include: (1) providing recipient identifier and group identifier information for each group to which a recipient is a member; and (2) storing acknowledgement data for each group member that lists them and indicates their response (e.g., "…*storing acknowledgement data in the memory device for each of the group members, the acknowledgement data comprising a listing of each of the group members and an indication of response for each of the group members*").  In previous systems, referring again to the incident commander's scenario for example, after a volunteer group was alerted by pager, the incident commander would not know who was going to respond until personnel began to arrive on scene.  In contrast, with the claimed "deterministic" group messaging systems, incident commanders (or group administrators) are updated in response to the group messages dispatched. Responses are linked to endpoint recipients within the group context, an advantage

---

[1] *See* '207 Patent: col. 2, lines 22-26.

and novel advancement achieved by the inventive group management scheme.  In this way, the inventive systems and methods provide a valuable concrete result: deterministic status information provided to a network client device for groups of endpoint recipients across a two-way wireless communication network.

34.     Accordingly, the Asserted Claims of the '659, '207, and '888 Patents are directed to a specific two-way wireless architecture appended with a group management and maintenance system based upon group and recipient identifiers for identifying with and selectively communicating with endpoint recipients across the network.

35.     Acknowledged group messaging may be performed in ways and across architectures that differ from the claimed subject matter.  While the advantages of the inventions likely will not be achieved, two-way messaging with selective groups of endpoints and management of such groups may be performed using other methods such as frequency division across the geographical region or focused transmission, encryption, or having multiple radios in the network infrastructure for communicating with predetermined groups based upon location.

36.     The Asserted Claims provide structure and limit the invention to particular and novel ways of deterministically messaging selective groups of recipients on a two-way wireless communication network.  These structural

limitations describing architecture, integrated computer-based operations necessary to practice the patent claims (e.g., database tables, communication at network client with server/switch), wireless network protocol capable of communicating with groups, and endpoints that can receive and interpret those signals provide meaningful structural limitations that one of skill in the art would recognize as distinctions between network types.

37.     The operations, function, and results of the subject matter of the Accused System cannot be carried out and achieved by a human or generic computer or by using a generic two-way wireless radio network.

38.     Generic computer networks or wireless two-way radio networks do not perform "group communication and response tracking" or "group management and maintenance" as those general concepts are claimed in the Asserted Patents.

39.     Some of the major advantages of the claimed systems and advances over the prior art are discussed in the specification (centralized management and administration of groups and recipients' relationships with groups, effectively communicating with multiple endpoints in groups, and tracking status across a network by group).  One skilled in the art at the time of the inventions would further recognize additional advantages including management of groups across a dispersed area or networks, tracking status information of recipient groups

including whether individual group members have receiver or read a group message, and monitoring this information at a dispatch center.

40.     By the novel combination of its two-way wireless network architecture, group management and maintenance scheme, and deterministic messaging functionality, the Asserted Patents present a specific, inventive solution to the problem the inventors recognized with messaging networks at the time of their invention.

### GroupChatter '249 Patent

41.     The Asserted '249 Patent describes socially networking a plurality of mobile terminal users in order to share published personal content among users and provide notifications and acknowledgements rating such content.

42.     The invention of the '249 Patent facilitates a social networking system that works seamlessly across both fixed networks (e.g., a local area network) and mobile networks (cellular networks). (*See* '249 patent, ABSTRACT).

43.     While working at a global telecommunications firm, the inventors of the GroupChatter Asserted '249 Patent leveraged an IP mobile network and a fixed network to provide real-time or near real-time communication and content sharing among mobile terminal users.

44.     At the time of invention, the feature set on a fixed network (e.g.,

accessed by a desktop computer) was different from features now commonly performed on mobile devices.  For example, a YouTube user could post videos to the Internet; however, his friends could only access the content from a fixed network.  (*See* '249 patent, col. 1, lines 24-35).  Such access to a friend's posted content was not easily provided over cellular networks.  In some cases, a mobile handset user could provide location information to his friends, but at the time of the invention, such services required manual registration with a provider's website. In any event, such services that existed at the time of the invention did not allow users to share their user-generated content (e.g., photos, video) over mobile networks (*See* '249 Patent, col. 1, lines 33 - 41) as contemplated in the '249 Patent.

45.     Within this technological landscape, the inventors recognized a need for better social networking technology.  The inventors leveraged an IP mobile network and a fixed network to provide what was, at the time, a next generation social networking experience that included real-time communication and content sharing to users of mobile terminals.  As recited in the claims and described in the patent specification, the '249 Patent invention enables a complex feature set, where users receive friend updates (regarding posts, messages, etc.) in real time on both mobile and fixed networks.

46.     Claim 1 of the '249 Patent recites a method for socially networking

including enabling a mobile terminal user to: (1) set up and view a personal list of other mobile terminal users; (2) view presence information indicating selected other mobile terminal users; (3) establish communications with one or more of the other users; (4) view posted content obtained by other mobile terminal users; (5) receive a pop-up notification on a television/computer when other users publish new personal content; and (6) interact with the television/computer to view and rate the new personal content.  As the '249 Patent describes, performing the method requires complex back-end servers, subsystems, programming, and mobile terminals to provide users real-time access to information (e.g., the location, presence, status and preferences for their friends).

47.    The claimed invention is necessarily rooted in computer and communication technologies and improves the functioning of these systems using complex schemes for communicating between and across mobile and fixed platforms. The '249 patent describes example hardware/software environments in its FIG. 1, reproduced below:



48.    In the above figure (FIG. 1 from the '249 Patent), the social

networking system (item 100) includes mobile users (items 102a, 104a, and 106a)

that carry mobile terminals (items 102b, 104b, and 106b).  The system includes a

presence server (item 108), an application server (item 110), and a database (item

113).  The system further includes an IMS core (item 112) and a streaming video

server (item 114).  As shown, the presence server (108) is coupled via LAN (116a)

to the server 110, which is coupled via LAN (item 116b) to the IMS core (112),

which in turn is coupled via mobile networks (118a and 118b) to enable wireless

IP connectivity to the mobile terminals through wireless technologies including

CDMA, Wi-Fi, WiMAX, GPRS, and UTMS.  (*See* '249 Patent, col. 3, lines 20 –

30).  In addition, the IMS core (item 112) is coupled to the streaming video server

(item 114), which is coupled to mobile networks (items 118a and 118b).  The

video server (item 114) is also coupled via a network connection to a set-top box

(item 122) and a television/computer (item 124).

49.    In operation, the overall system leverages the IP (e.g., IMS) mobile

network (items 112, 118a, and 118e) and a fixed network (items 108, 110, and

114) to provide a next generation social network experience to the users (e.g., item

102a, 104a, and 106a).   The mobile terminals (items 102b, 104b, and 106b)

implement a standalone application (item 126) which enables their users to

perform a variety of steps recited in the claims.

50.    In an example scenario, a user wishes to know whether a friend is

present on the network.  Accordingly, the user first logs into his mobile application

and registers with remote a server ('249 Patent, col. 4, lines 14 - 28).  In an

embodiment described in '249 Patent, logging in and registering requires several

preconditions including: (1) the IMS core (an IMS proxy platform) is running; (2)

the mobile terminal has an IP connection to the IMS proxy platform; (3) the user

has not yet registered with the remote server; (4) the mobile terminal is not running

the mobile application.

51.    After logging in and registering, the '249 patent contemplates several potential actions by the mobile terminal user including: (1) establishing a voice call ('249 patent, col. 5, line 25 – col. 6, line 24); participating in an Instant Messaging (IM) session ('249 patent, col. 6, line 25 - col. 7, line 24); establishing a voting queue ('249 patent, col. 7, line 25 – col. 8, line 55); participating in a scorekeeper scenario (e.g., for scoring photographs) ('249 Patent, col. 8 line 57 – col. 9 , line 48); and viewing a map of associates ('249 patent, col. 9, line 49 - line 41).  This functionality and the other aspects of the '249 patent claims were not known at the time of the invention.

52.    In addition to the specialized network components required, the '249 Patent requires specialized mobile components.  For example, one embodiment specifies a mobile terminal (e.g. phone) with a user interface (e.g., operating system), a camera, and an application that enables the user to: (1) set up and view friend lists; (2) monitor presence information of friends; (3) establish electronic communications with other mobile terminal users; and (4) view content obtained and posted by other mobile terminal users.  *See* '249 Patent col. 1, line 63 - col. 2 line 6.  The mobile terminals are specially programmed (via an application) to communicate through mobile networks with servers that, in turn, communicate to

update users via their computers/televisions. In this way, groups of users are
updated in real time across multiple platforms, and each device is synchronized
with the most relevant and current data.

## VIBER

53.     Defendants independently and/or collectively provide the Viber
ecosystem, which enables users to communicate seamlessly across mobile phones,
tablets, and computers regardless of each device's operating system.

54.     Viber calls its system a "cross-platform" communication system.



55.     Viber users download and install the Viber software and may install a
copy of the software on each of their devices.

56.     Viber refers to using its software as "Vibering."  To "Viber" means to
use the Viber software.

57.     Once installed, Viber software accesses a user's contacts and provides
a notification to the user identifying the user's contacts that also Viber.

58.     The Viber ecosystem permits the users to communicate (or Viber)
with other users in various ways.

59.     Viber users can exchange messages, share photos, share "stickers," share videos, chat, place voice calls, place video calls, group share, and receive notifications.

60.     Viber users can join groups, follow users and participate in "Public Chats."

61.     To communicate using the Viber ecosystem, Viber users must use the Viber software (i.e., apps) provided by Defendant.

62.     Viber software is available at www.viber.com (via web browser) and from app stores operated by Apple, Google, Microsoft, and RIM.

63.     The Viber software is available for various hardware including Apple devices (e.g., iPods, iPhones, and iPads running each iOS version), Android-based devices (e.g., cell phones, tablets, and computers running each Android version), BlackBerry OS devices, Microsoft Windows based devices (e.g., cell phones, tablets, and computers running each Windows version), Linux-based devices, and Symbian-based devices.

64.     According to Defendants, Viber for Desktop is currently available for the following systems:

## System and hardware requirements (Viber for Desktop)

Please ensure that you have one of the following installed on your mobile device:

— **Android** – Viber 3.0, or higher
— **iPhone** – Viber 3.0, or higher
— **Blackberry** – Viber 2.4 (does not support call transfers to Viber for Desktop), or higher
   — Please note, excluding Blackberry 10, you will only be able to use Viber on
      Blackberry devices *if it is already downloaded and activated on your device*.
— **Windows Phone 8** – Viber 2.2.3 (partial compatibility, may encounter sync issues), or
  higher
— **S60** – Please note, you will only be able to use Viber on your Nokia S60 *if it is
  already downloaded and activated on your device*.

Please also make sure your computer meets the system and hardware requirements below:

— **Windows:**
  — Windows XP Service pack 3 and above.
  — Windows Vista
  — Windows 7
  — Windows 8*
  — Windows 10**

— **Mac:**
  — OSX 10.7.5 and above.

— **Linux:**
  — 64-bit distributions only
  — Debian and Fedora distributions only

65.     According to Viber, iPhone 4S and later and iPads running iOS 8 and above are supported devices.

66.     According to Viber, Android smartphones and Android Wear running OS 4.0 and above are supported devices.

67.     According to Viber, Windows 10 smartphones and tablets are supported devices.

68.     According to Viber, Blackberry 10 and full-touch Blackberry devices

running version 10.2.1 and above are supported devices.

69.    Using Defendant's Viber software, these devices operate over cellular connections (e.g., 3G,4G, LTE) or Wi-Fi connections to provide "cross-platform" communication among Viber users.

70.    <u>Viewing Posted Content</u> – Using the Viber app, a user is able to post content (e.g. chat messages, stickers, pictures, etc.) to an ongoing thread (e.g., Group or Public Chat) between another Viber user or group of Viber users.  Users in that thread may then view the posted content, respond to that content, and post their own content.

71.    <u>Communicating and Sending Messages</u> - Viber users communicate with friends, fellow users, and group members in a variety of formats including through chats, message feedback, pictures, videos, stickers, calls, video calls, photos, winks, sharing locations, and doodles.

72.    Viber provides users the ability to connect with specific sets of users (e.g., family, teammates, or co-workers) to share updates, photos, messages, and documents.

73.    <u>Groups</u> – Viber "Groups" permits users to communicate with (e.g., broadcast a group message to) defined groups of users (e.g., for family, teammates or coworkers).  From 2013 to 2014, Viber claims a 10x growth in group messages.



74.     Viber Group Conversations allow users to communicate with fellow group members by sending, for example, text messages, stickers, photos, videos, photos, doodles, or documents.  Group Chats allow a user to post content to up to 200 participants at one time.



**How do I use group conversations on my Windows Phone?**

Home › Features and Functions › How do I use group conversations on my Windows Phone?

## How do I use group conversations on my Windows Phone?

Whether you want to have a conversation with friends throughout the day, keep in touch with family or stay on-task with colleagues, you will find using groups simple and fun! Choose the action you need help with below:

— Starting a group conversation
— Adding participants to a group
— Removing participants from a group
— Changing the group name
— Group notifications
— Exiting a group
— Deleting a group

**Starting a group conversation**
1. Swipe to the **chats** screen
2. Select the ➕ icon at the bottom right
3. Select up to 99 participants you would like to add to the group or enter a phone number

75.   <u>Acknowledging, responding to, and Rating Content</u> – Through Group

Conversations and Public Chats, Defendant enables users to view and rate new

personal content provided by other users.  For example, a user may provide

feedback to posted content by clicking a heart that is next to the posted content.

Below is a snippet from Defendant's support website

(https://support.viber.com/customer/en/portal/articles/2147187-likes-and-seen-

status-in-group-conversations?b_id=3838#like) that advises users regarding how to

"like" a message:



76.   <u>Notifications</u> – Viber provides various notifications to users regarding posts, responses, and acknowledgments.

77.   Viber users receive text and graph notifications from their browser or app (i.e., a network client) to alert them of any relevant posts, messages, calls, and other content.  Viber also provides real-time presence notifications and the read status for group and individual messages.

78.   Viber realizes substantial value from the group messaging feature of

the Viber application and platform.

79.     In Viber versions 5.7+ for Android or iOS, and Viber Version 6.1+ for Windows 10, users can "like" group messages, and senders of group messages can see who liked their messages and check the "seen status" of their message.

80.     Viber describes the notification feature of its group messaging application at https://support.viber.com/customer/portal/articles/2147187-likes-and-seen-status-in-group-conversations#notifications:

> *Will I receive notifications for likes?*
>
> *With this new feature you will only receive notifications if someone in the group likes your message post. When someone likes your message in a group chat you will receive a notification banner to your device. If your message receives numerous likes the notifications will be aggregated and you will not receive separate notifications for each like.*

81.     Viber provides the following description of its Group Chat feature:



Home › FAQs › **What are group conversations (groups)?**

## What are group conversations (groups)?

Use group conversations to chat with friends, family, colleagues and any Viber users! Groups offer you a comfortable forum for discussion with the people you want to reach, right in your phone.

Viber groups are fun and flexible. Here are some of the features we love:

— Anyone can create a group and there is now a **group admin** role
— Only group admins can remove participants and add other admins
— Each group member can add new participants to the conversation
— There is no limit to how many groups you can create!
— Each group can have up to **200 participants**, including the group creator
— You can customize the background of the conversation to fit your mood
— Now you can personalize conversations with a group icon
— Conversation galleries keep all of your shared media - photos, video and doodles!
   - in one place so you don't have to go scrolling for memories!

**Learn how to use groups on:**
Android  |  iPhone  |  Windows Phone

82.     By tapping and holding the message, then selecting INFO on Android/iOS or LIKES on Windows 10, a sender can see who liked the message as well as who say the message.

83.     Using Viber to send a group message, a user can see who has seen her message and the time it was viewed:

## How do I see who has seen my message?

1. Follow steps 1-2 above
2. Here you will see who has seen your message and the time it was viewed



84.     Viber infringes the GroupChatter Asserted Patents by making, using, monetizing, providing, deploying, and testing the Viber ecosystem including Viber infrastructure (e.g., server-based systems), Viber.com, and the various Viber apps that users install on phones, tablets, and computers.  These infringing Viber components and Viber systems are the "Accused Systems."

**COUNT I**
**INFRINGEMENT OF U.S. PATENT NO. 7,945,249**

85.     GroupChatter incorporates paragraphs 1 through 84 herein by reference.

86.     GroupChatter is the owner, by assignment, of U.S. Patent No. 7,945,249 (the "'249 Patent"), titled "NEXT GENERATION SOCIAL

NETWORKING AND CONTENT RATING SYSTEM AND METHOD."

87.     A true and correct copy of the '249 Patent is attached as Exhibit A.

88.     As the owner of the '249 Patent, GroupChatter holds all substantial rights in and under the '249 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

89.     The United States Patent Office granted the '249 Patent on May 17, 2011.

90.     The '249 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

91.     Viber has directly infringed, and continues to infringe, the '249 Patent by practicing one or more claims of the '249 Patent, including at least claims 1, 2, 3, 6, 7, 8, 9, 12, 13, and 14 (the '249 "Asserted Claims") by making, using, providing, deploying, testing and monetizing the Viber Accused Systems to provide a social network for mobile terminal users to view lists of users and their availability to communicate.

92.     Defendants, by operating and providing the Accused Systems, perform methods for socially networking a plurality of mobile terminal users. Using Viber as instructed and intended, a mobile terminal user can setup and view

lists of contacts, view presence information indicating the availability of other users, establish communications with other users, view previously posted content by other users, receive pop-up notifications on a computer when other users publish new content (e.g. messages), and interact with the television/computer to view and rate the published content.

93.     Claims 7 and 14 recite mobile terminals having a user interface, camera, and a processor implementing an application for setting up and viewing a personal list, viewing presence information of other users, establishing communications with other users, viewing posted content obtained by other users and performing related actions as recited in the claims.

94.     Viber directly infringes claims 7, 14 and their asserted dependent claims when it uses, tests, and activates or makes this functionality using mobile terminals to interact with Viber.com and the Viber apps.

95.     Defendants instruct users of Viber.com and the Viber apps how to implement the application for setting up and viewing a personal list, viewing presence information of other users, establishing communications with other users, viewing posted content obtained by other users and performing related actions as recited in the claims using mobile terminals (e.g., smartphones).

96.     Viber provides an application enabling end users to setup and view

personal lists, view presence information, establish communications, view posted content obtained by other users, publish that a photo or video has been taken, and notify other users about the photo or video, and send the photo or video to a server that enables distribution.

97.     Viber is on notice that the Viber applications are especially made or especially adapted for use in infringing the '249 Patent.

98.     The Viber apps along with their relevant functionality are not a staple article or commodity of commerce suitable for substantial non-infringing use.

99.     Viber provides applications and interfaces for mobile terminals (e.g., phones, tablets, computers) and encourages end users to use Viber in ways that infringe the '249 Patent.

100.    GroupChatter has been damaged as a result of Viber's infringing conduct described in Count 1.  Defendants are liable to GroupChatter in an amount that adequately compensates it for their infringement, which amount, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 2
## INFRINGEMENT OF U.S. PATENT NO. 8,588,207

101.   GroupChatter incorporates paragraphs 1 through 100 herein by reference.

102.   GroupChatter is the owner, by assignment, of U.S. Patent No. 8,588,207 (the "'207 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

103.   A true and correct copy of the '207 Patent is attached as Exhibit B.

104.   As the owner of the '207 Patent, GroupChatter holds all substantial rights in and under the '207 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

105.   The United States Patent Office granted the '207 Patent on November 19, 2013.

106.   The '207 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

107.   Defendant practices one or more claims of the '207 Patent, including at least claims 1, 2, 3, 5, 6, 8, 9, 11, and 12, by making, using, monetizing, testing, offering for sale, selling, and/or importing the Accused Systems for operation as a deterministic group messaging system used by Viber users to exchange group

messages over wireless networks (e.g., cellular, Wi-Fi, WiMAX, wireless broadband).

108.   Viber has directly infringed and continue to infringe the '207 Patent by deploying, testing, using, providing, monetizing, and operating the Accused Systems to provide acknowledged group messaging to users and perform acknowledged group messaging.

109.   The Accused Systems provide users the ability to start group conversations and exchange messages among members of a group using mobile devices operating on wireless networks.

110.   Viber IDs are part of a user's profile.  Defendant uses this information to help Viber users find other Viber users and to organize a user's information within the Viber infrastructure (e.g., on Viber servers):

111.   From within the Viber app, a user selects the "New Group" button to create a group.  Once the group members are selected, one of the "Chat Admins" may change the group identifier or "Group Name" and include additional members having recipient identifiers.

112.   Group information is stored on Viber servers:



113.   In the context of the Asserted Claims, a Viber app may act as network client to transmit to the Viber infrastructure (e.g., a Viber server) a request for wireless transmission of a group message.

114.   Viber transmits group information related to the group address, group membership, and/or recipient identifying information via the Viber infrastructure to a network client (e.g., Viber app).

115.   The Accused Systems broadcast group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

116.   The Accused Systems receive acknowledgements from group members via the user's wireless network (e.g., Wi-Fi network or cellular network). For example, a message-initiating user will see when her message is delivered and when the recipient user sees it.

117.   Viber tracks and updates a message's status from "Delivered" to "Seen" when appropriate.  Users may respond to group messages with emoticons, messages, or read indicators sent from their mobile device.

118.   When membership changes in a Viber group, membership data on the Viber server system is updated along with affected users' mobile devices.

119.   Defendants' infringing conduct described in this Count has damaged GroupChatter.  Viber is liable to GroupChatter in an amount that adequately compensates it for infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 3
## INFRINGEMENT OF U.S. PATENT NO. 9,014,659

120.   GroupChatter incorporates paragraphs 1 through 119 herein by reference.

121.   GroupChatter is the owner, by assignment, of U.S. Patent No. 9,014,659 (the "'659 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

122.   A true and correct copy of the '659 Patent is attached as Exhibit C.

123.   As the owner of the '659 Patent, GroupChatter holds all substantial rights in and under the '659 Patent, including the right to grant sublicenses,

exclude others, and to enforce, sue, and recover damages for past and future infringement.

124.   The United States Patent Office granted the '659 Patent on April 21, 2015.

125.   The '659 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

126.   Viber is practicing one or more claims of the '659 Patent, including at least claims 1, 2, 3, 4, 5, 7, 8, 10, 11, 12, 13, 14, 16, and 17, by making, using, offering for sale, monetizing, selling, and/or importing the Accused Systems that provide a deterministic group messaging system to Viber users who exchange group messages over wireless networks (e.g., cellular, Wi-Fi, WiMAX, or wireless broadband).

127.   Viber has directly infringed and continues to infringe the '659 Patent by deploying, testing, using, monetizing, and operating the Accused Systems to provide acknowledged group messaging to users and perform acknowledged group messaging.

128.   The Accused Systems operate on computers, desktop computers, laptops, smartphones, tablets, and mobile devices and communicate using cellular and/or Wi-Fi networks.  Such hardware having the Viber apps installed are

included in the definition of "Accused Systems."

129.   Accused Systems provide Viber users the ability to start group conversations and exchange messages among members of a group via mobile devices operating on wireless networks.

130.   Viber stores on its servers data relating to recipients, groups created by users, and group membership information.

131.   Viber IDs are part of a user's profile.  Defendant use this information to help Viber users find other Viber users and to organize a user's information internally on the Viber servers.

132.   Viber provides to mobile devices running Viber app(s) group information such as group membership and recipient identifying data stored on the Viber server infrastructure.

133.   A user selects the "New Group" button to create a group having a group identifier or "Group Name" and include members having recipient identifiers.

134.   Viber transmits Group messages wirelessly to mobile devices corresponding to each recipient in the selected group.

135.   Mobile devices running a Viber app or accessing the Viber System via a web browser receive a group message and respond with acknowledgement of

receipt, an alphanumeric text reply, and/or indication the group message has been received but not read by the user.

136.   Viber stores acknowledgement data for each group member in memory.

137.   Enabling the Viber "Online" Status option will make a user's online status visible to other users, and disabling the option will hide a user's online status and the status of other users.

138.   The Viber "Using App" Status option let's a user's Viber contacts know when the user is Vibering.

139.   The Viber "Seen" Status displays the "seen" status when other users have seen the user's messages and will display the "seen" status to other users when their messages have been seen.

140.   Viber sends messages to the Accused System's network clients based on stored acknowledgement data.

141.   The Accused Viber System broadcasts group messages to users via the users' wireless networks (e.g., cellular or Wi-Fi networks).

142.   The Accused Viber System receives acknowledgement responses from group members via the wireless network used by a user's device.

143.   The Accused Viber Systems provide acknowledgement responses

indicating to the network client who has seen the group message.  For example, a message-initiating user will see when her message is delivered and when the recipient sees it.

144.   Users may respond to group messages in Viber with stickers, emoticons, messages, or read indicators sent from their mobile device.

145.   When membership changes in a Viber group, Defendant updates membership data on the Viber infrastructure (e.g., Viber servers) and any user's device (e.g., phone or computer) that may be affected by the change.

146.   The Accused Viber System provides acknowledged group messaging.

147.   Viber servers store recipient identifiers for each group member, a group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

148.   Viber stores group information on user devices having the Viber application installed.

149.   When a group message is initiated, the Viber client application within the Accused Systems causes wireless transmission of the group message to mobile devices corresponding to group recipients.  In turn, mobile devices receiving the group message transmit a response.

150.   In operation, the Viber client application in the Accused Systems

monitors group message information relayed by Viber infrastructure (e.g., servers) for group message responses.  The client application stores acknowledgement data and message status information for each group member.

151.   Viber instructs and encourages end users of the Viber Accused Systems to use the Viber Group Chat features.  Viber is on notice of the Asserted Patents and the conduct by Viber and its end users and customers that infringes them.

152.   As a result of Viber's infringing conduct described in this Count, GroupChatter has been damaged.  Defendants are liable to GroupChatter in an amount that adequately compensates it for Defendant infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 4
## INFRINGEMENT OF U.S. PATENT NO. 9,294,888

153.   GroupChatter incorporates paragraphs 1 through 139 herein by reference.

154.   GroupChatter is the owner, by assignment, of U.S. Patent No. 9,294,888 (the "'888 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

155.   A true and correct copy of the '888 Patent is attached as Exhibit D.

156.   As the owner of the '888 Patent, GroupChatter holds all substantial rights in and under the '888 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

157.   The United States Patent Office granted the '888 Patent on March 22, 2016.

158.   The '888 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

159.   Defendant are practicing one or more claims of the '888 Patent, including at least claims 1, 2, 3, 4, 5, 10, 11, 12, 13, and 14, by making, testing, importing, deploying, using, and/or monetizing the Viber Accused System and subsystems that provide a deterministic group messaging system through which Viber users exchange group messages over wireless networks (e.g., cellular, Wi-Fi, WiMAX, and wireless broadband).

160.   Viber has directly infringed and continues to infringe the '888 Patent by deploying, testing, deploying, importing, monetizing, using, or operating the Accused Systems to provide acknowledged group messaging to users and perform acknowledged group messaging.

161.   Accused System components (e.g., Viber apps) operate on desktop

computers, smartphones, laptops, tablets, and mobile devices that communicate using cellular and/or Wi-Fi networks.

162.   The Accused System provides users the ability to start group conversations and exchange messages among members of a group via mobile devices operating on wireless networks.

163.   Viber stores on Viber infrastructure (e.g., servers) data relating to recipients, groups created by users, and group membership information.

164.   Viber IDs are part of a user's profile.  Defendant provides this information to help users find other available Viber users.  Viber collects and organizes user information internally on the Viber servers.

165.   Viber provides group information (e.g., group membership and recipient identifying data stored on the Viber servers) to mobile devices running the Viber client application within the Accused Systems.

166.   A user selects the "New Group" button to create a group having a group identifier or "Group Name" and include members having recipient identifiers.

167.   Viber wirelessly transmits group messages to mobile devices corresponding to each recipient in the selected group.

168.   Mobile devices running a Viber client application receive a group

message and respond with acknowledgement of receipt, an alphanumeric text reply, and/or indication the group message has been received but not read by the user.

169.   Viber stores acknowledgement data (e.g., confirmation of receipt, a read receipt, or indication a reply was sent) in memory.

170.   Viber sends messages to client applications within the Accused Systems based on stored acknowledgement data.

171.   The Accused System broadcasts group messages to members via wireless networks (e.g., cellular or Wi-Fi networks) on which network client devices are operating.

172.   The Accused Systems receive acknowledgement responses from group members via the wireless network being used by the respective Viber user's device.

173.   For example, a message-initiating user will see when her message is delivered and when the recipient user sees it.

174.   Users send personal messages using the Accused Systems.

175.   Viber provides acknowledgement responses indicating to the network client who has seen the group message and who among group members has not.

176.   Users may respond to group messages in Viber with emoticons,

messages, or read indicators sent from their mobile device.

177.   When membership changes in a Viber group, the Accused Systems update membership data on the Viber server systems along with affected users' mobile devices.

178.   Viber provides acknowledged group messaging.

179.   Viber servers store recipient identifiers for each group member, a group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

180.   Viber stores group information on a user's mobile device(s).

181.   When a group message is initiated, a user's client application within the Accused System causes wireless transmission of a group message to mobile devices corresponding to group recipients.  Mobile devices receiving the group message transmit a response.

182.   In operation, a Viber client application monitors group message information relayed by Viber servers for group message responses and stores acknowledgement data comprising an indication that the group message was received, a group message was read, or a reply was sent by the recipient.

183.   Viber encourages its users and customers to use the Group Chat features of Viber.com and the Viber apps.

184.   Viber is on notice of GroupChatter's claims on the '888 Patent and the conduct by Viber and its end users that is accused of infringement.

185.   GroupChatter has been damaged as a result of Viber's infringing conduct.  Viber is liable to GroupChatter in an amount that adequately compensates it for Defendant' infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## NOTICE

186.   GroupChatter does not currently distribute, sell, offer for sale, or make products embodying the asserted GroupChatter Patents.

187.   GroupChatter instructs its licensees to mark all licensed products sold, distributed, offered for sale, or made under license to the GroupChatter Patents and has undertaken reasonable efforts as required to comply with the notice requirements of 35 U.S.C. § 287.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

188.   Defendants are hereby notified it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source

material, and other information and tangible things that Defendants know, or

reasonably should know, may be relevant to actual or potential claims,

counterclaims, defenses, and/or damages by any party or potential party in this

lawsuit, whether created or residing in hard copy form or in the form of

electronically stored information (hereafter collectively referred to as "Potential

Evidence").

189.   As used above, the phrase "electronically stored information" includes

without limitation: computer files (and file fragments), e-mail (both sent and

received, whether internally or externally), information concerning e-mail

(including but not limited to logs of e-mail history and usage, header information,

and deleted but recoverable e-mails), text files (including drafts, revisions, and

active or deleted word processing documents), instant messages, audio recordings

and files, video footage and files, audio files, photographic footage and files,

spreadsheets, databases, calendars, telephone logs, contact manager information,

internet usage files, and all other information created, received, or maintained on

any and all electronic and/or digital forms, sources and media, including, without

limitation, any and all hard disks, removable media, peripheral computer or

electronic storage devices, laptop computers, mobile phones, personal data

assistant devices, Blackberry devices, iPhones, video cameras and still cameras,

and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of Defendants' agents, resellers, or employees if Defendants' electronically stored information resides there.

190.   Defendants are hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Defendants' claims and/or defenses.  To avoid such a result, Defendants' preservation duties include, but are not limited to, the requirement that Defendants immediately notify its agents and employees to halt and/or supervise the auto-delete functions of Defendants' electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## JURY DEMAND

GroupChatter hereby demands a trial by jury on all claims, issues and damages so triable.

## PRAYER FOR RELIEF

GroupChatter prays for the following relief:

a.  That Defendants be summoned to appear and answer;

b.  That the Court enter an order declaring that Defendants have infringed the '249 Patent, the '888 Patent, the '207 Patent, and the '659 Patent.

c.  That the Court grant GroupChatter judgment against Defendants for all actual, consequential, special, punitive, increased, and/or statutory damages, including, if necessary, an accounting of all damages; pre and post-judgment interest as allowed by law; and reasonable attorney's fees, costs, and expenses incurred in this action;

d.  That Defendants be found jointly and severally liable for all damages owed to GroupChatter;

e.  That Defendants infringement has been willful; and

f.  That GroupChatter be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated:  September 22, 2016          Respectfully submitted,

By:  /s/*Daniel A. Kent*
          Daniel A. Kent
            Georgia Bar Number 415110
            dankent@kentrisley.com
          **KENT & RISLEY LLC**
          555 N Point Ctr E Ste 400
          Alpharetta, GA 30022
          Tel:  (404) 585-4214
          Fax:  (404) 829-2412

          Cabrach J. Connor (pro hac vice)
          cconnor@taylordunham.com
          David E. Dunham (pro hac vice)
          ddunham@taylordunham.com
          Jennifer Tatum Lee (pro hac vice)
          jtatum@taylordunham.com
          **TAYLOR DUNHAM AND RODRIGUEZ LLP**
          301 Congress Ave., Suite 1050
          Austin, Texas 78701
          512.473.2257 Telephone
          512.478.4409 Facsimile

          **ATTORNEYS FOR PLAINTIFF**